775 A.2d 209 (2000)
341 N.J. Super. 276
F.M. KIRBY, Plaintiff-Appellant,
v.
TOWNSHIP COMMITTEE OF THE TOWNSHIP OF BEDMINSTER, In the County of Somerset, and Township of Bedminster Planning Board, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued March 29, 2000.
Decided June 23, 2000.
*211 William W. Lanigan, Somerville, for appellant.
Howard D. Cohen, for respondent Township Committee of the Township of Bedminster (Stern & Greenberg, attorneys, and Vogel, Chait, Schwartz & Collins, attorneys for respondent Township of Bedminster Planning Board; Mr. Cohen and Thomas F. Collins, Jr., on the joint brief).
John J. Farmer, Jr., Attorney General, for amicus curiae New Jersey State Planning Commission (Mary C. Jacobson, Assistant Attorney General, of counsel; Daniel P. Reynolds, Senior Deputy Attorney General, on the brief).
Rutgers Environmental Law Clinic, for amicus curiae New Jersey Future, Inc. (John Payne and Edward Lloyd, on the brief).
Before Judges BROCHIN and EICHEN.
*210 PER CURIAM.
Plaintiff F.M. Kirby is the owner of a large tract of land in Bedminster Township. By an action in lieu of prerogative writs, he challenged the validity of two land use ordinances adopted by the Bedminster Township Committee. Ordinance No. 94-26 (the R-10 ordinance) changed the zoning in the area in which plaintiff's land is situated from an R-3 Rural Residential Zone, which permitted one residence for every three acres, to an R-10 Rural Residential Zone, which permits one residence for every ten acres. Ordinance No. 95-25 permits lot-size averaging within the R-10 zone, allowing the minimum area of a lot within a development to be reduced to six acres provided that the average area of lots throughout the development is ten acres. The Law Division (Honorable Robert E. Guterl, J.S.C.) sustained the validity of the ordinances.
Plaintiff has appealed. He argues the following points in support of his appeal:
POINT ONE: NO OBJECTIVE FACTS EXIST IN THE RECORD TO SUPPORT A CHANGE IN ZONING FROM ONE RESIDENTIAL UNIT FOR THREE ACRES TO ONE RESIDENTIAL UNIT FOR TEN ACRES ON PLAINTIFF'S LAND
POINT TWO: THE ORDINANCE IS ARBITRARY, CAPRICIOUS AND UNREASONABLE AND SHOULD BE SET ASIDE
POINT THREE: IN SPITE OF THE "ZONING CANT," THE RECORD DOES NOT IDENTIFY OR DISCLOSE ANYTHING SPECIFIC TO BE PROTECTED BY THE NEW ORDINANCES
POINT FOUR: A REVIEW OF THE EXPERT REPORT OF FRANCIS J. BANISCH, BEDMINSTER'S PROFESSIONAL PLANNER, DATED *212 JANUARY 6, 1996, DEMONSTRATES THE INADEQUACY OF ANY BASIS TO INCREASE THE DENSITY OF THE ZONE
POINT FIVE: THE AMENDED ORDINANCE WHICH PURPORTS TO PROVIDE FOR A LOT AVERAGING IS UNCONSTITUTIONALLY VAGUE WITHOUT ANY STANDARDS
POINT SIX: THERE HAS BEEN A TAKING BY THE ARBITRARY CHANGE TO TEN ACRE ZONING
POINT SEVEN: EVEN THE COURT-APPOINTED PLANNER HAS CONCLUDED THAT TEN ACRE ZONING ON PLAINTIFF'S LAND IS UNREASONABLE
POINT EIGHT: THE COURT APPOINTED EXPERT REPORT SUPPORTS THE POSITION THAT THE 10 ACRE ZONING SHOULD BE SET ASIDE
POINT NINE: THE ILLEGAL ZONING HAS DEPRIVED PLAINTIFF OF THE USE OF HIS PROPERTY AND IS A "REGULATORY TAKING"
POINT TEN: "... WHERE THE GOVERNMENTS ACTIVITIES HAVE ALREADY WORKED A TAKING OF ALL USE OF PROPERTY, NO SUBSEQUENT ACTION BY THE GOVERNMENT CAN RELIEVE IT OF THE DUTY TO PROVIDE COMPENSATION FOR THE PERIOD DURING WHICH THE TAKING WAS EFFECTIVE"
POINT ELEVEN: THE OPINION OF THE COURT BELOW DOES NOT ADDRESS THE LACK OF A RECORD SUPPORTING THE ZONING
Bedminster is a twenty-six-square-mile municipality located in the northwest corner of Somerset County and is bordered by the municipalities of Tewksbury and Readington to the west, Branchburg and Bridgewater to the south, Peapack-Gladstone, Far Hills and Bernards to the east, and Chester to the north. Route 78 runs east-west in the southern portion of the municipality. Route 202/206 and Route 287 run in a north-south direction in the eastern portion. Three county roads, Pottersville Road, Lamington Road and Burnt Mills Road, traverse the Township in a generally east-west direction. These roads are linked with a network of local roads, many of which are narrow and unpaved. Residential and commercial development has centered in the villages of Bedminster and Pluckemin and the hamlet of Pottersville; Bedminster and Pluckemin are located in the eastern quadrant of the municipality, while Pottersville is located in the extreme northern quadrant. Office complexes and Mount Laurel[1] housing are located in the eastern quadrant, east of Route 202/206 and Route 287. This area, unlike the rest of the Township, is sewered and has customarily been referred to as the Township's "growth corridor." Approximately seventy percent of the land in the Township is either farmland or vacant, and approximately two-thirds of the land is under farmland assessment.
Plaintiff's property includes three parcels comprising over 131 acres. It is located south of Route 78 and directly east of Route 287 at the Township's border with Bridgewater. These parcels are designated on the Bedminster tax map as Block 62, Lots 10 and 10Q (106.8 acres); Block 71.02, Lot 1Q (23.3 acres); and Block 69, Lot 4 (1.38 acres). Together, they form a *213 somewhat rectangular piece of land running west from Route 287, and some 2000 feet south of Route 78. The land is traversed by, and has access to, Country Club Road, a two-lane local road, and has frontage on Meadow Road, also a two-lane local road. Country Club and Meadow Roads have been identified as scenic corridors in the Township's master plan. Route 287 lies directly to the east; agricultural lands, woodlands and low density residential uses lie south and west of the site; and agricultural lands and woodlands lie to the north. A portion of the northerly property line of plaintiff's property adjoins a twenty-one unit residential subdivision, with lots ranging from one to five acres, which predates the Township's 1946 zoning ordinance. Within one-half mile of the site to the south are one-acre residential lots in Bridgewater. An entrance to Route 287 north is approximately six miles from the site; an entrance to Route 287 south is approximately nine miles away; entrances to Route 78, both north and south, are approximately four miles away.
The site is mostly cleared for agricultural use, but woodlands and wetlands are on the eastern portion of the tract around a farm pond, and a finger of wetlands bisects the property in a north-south direction and around the southwestern corner. The site contains a flood plain on approximately one-third of the parcel, and the Chambers Brook runs along the eastern side of the tract. The site is relatively free of forest cover. The property is currently in agricultural use with a long history of farmland assessment, predating current ownership. A single family dwelling, with accessory structures, is located on Block 62, Lot 10.
Permitted principal uses within the R-10 rural residential district where plaintiff's property is located include farming, public and private day schools, private boarding schools, houses of worship, outdoor recreational uses and single family dwellings and their accessory structures. The R-10 district comprises most of the portion of Bedminster that lies west of Route 287, both north and south of Route 78.
From 1965 to 1977, the area approximating the R-10 district was zoned to permit residential development on five-acre lots. In 1982, following the adoption of the Township's 1979 master plan, the five-acre zone was converted to the R-3 (three-acre) district. Affordable housing litigation led to the Township's rezoning of the easterly portion of the municipality to provide for high density development. By 1994, the Township had exceeded its fair share obligation. In May 1996, Bedminster was granted substantive certification by the Council on Affordable Housing. A planned unit development known as "The Hills" comprises a large amount of the Township's fair share obligation.
At the time of adoption of the 1991 Land Use and Conservation Plan Elements of the Master Plan, the Planning Board identified a need to reconsider the lot size and density within the R-3 district, following the adoption of the State Development and Redevelopment Plan. The stated goals and objectives of the land use portion of the master plan include "maintain[ing] the special character of the countryside which has made Bedminster Township an attractive place for many generations, and manag[ing] future development to preserve the rural character, including the Township's meandering streams and brooks, open fields and pastures, tree shaded streets, and rolling landscape." The conservation element of the master plan indicates that many resource protection objectives would be better served by lower density development, such as large lot zoning and lot size averaging, within most of the R-3 district.
*214 On June 15, 1994, the Planning Board held a hearing on amending the land use and conservation elements of the Township's master plan to change the R-3 district to an R-10 district, and at the conclusion adopted a resolution reflecting that amendment. On October 6, 1994, the Planning Board held a hearing after which it passed a resolution recommending adoption of the R-10 district. The Township Committee adopted the ordinance after a hearing on October 17, 1994. The ordinance, which has a minimum lot area requirement of ten acres, was memorialized on the same date. The permitted uses are the same uses that were permitted in the R-3 district. The ordinance also contained a "grandfather" provision with respect to nonconforming lots:
The owner of any existing vacant lot of six (6) acres or more but less than ten (10) acres may be permitted to construct a dwelling unit thereon and may be permitted to construct an accessory building thereto without an appeal to the Board of Adjustment, provided that the total permitted building coverage and floor area ratio requirements of the R-10 district are not exceeded and the yard requirements are reduced by the same percentage that the lot bears to the zone district requirements. The owner of any existing lot of six (6) acres or more but less than ten (10) acres upon which a dwelling unit is situated may be permitted to construct additions to the principal building and/or to construct an accessory building thereto without an appeal to the Board of Adjustment, provided that the total permitted building coverage and floor area ratio requirements of the R-10 district are not exceeded and the yard requirements are reduced by the same percentage that the lot area bears to the zone district requirements.
On any lot of less than six acres, new dwelling units, additions or accessory buildings may be constructed in accordance with a schedule based on the size of the lot.
The Township applied to the State Planning Commission for a consistency review of its master plan. On February 24, 1995, the Commission adopted a consistency report. The report concluded that the Township's master plan is a "comprehensive document that contains objectives and element recommendations that will advance the intent of the State Plan." With respect to the master plan and the R-10 ordinance, the report found:
The Bedminster Township Master Plan meets the State Plan's intent to encourage growth in the center identified in the Suburban Planning Area[,] ... accommodate growth in centers in the Environmentally Sensitive Planning Area[,]... and protect and preserve tracts in the Environmentally Sensitive Planning Area.
In particular, the R-10 Rural Residential District, which seeks to protect the resource values listed in the Land Use Element of the Master Plan, including agriculture, forest and native vegetation resources, groundwater quality, scenic resources, steep slopes, surface water quality, and threatened and endangered species and habitats advances the intent of the State Plan's Environmentally Sensitive Planning Area.
Among the Commission's recommendations was modification of the R-10 zone to permit lot size averaging. The Township adopted such an ordinance on July 10, 1995.
The record in the present case contains various reports by experts for both sides. Plaintiff offered an evaluation of the R-10 zone by Scarlett Doyle, a professional planner. Doyle criticized the R-10 zone *215 because it did not allow for the fact that the large number of nonconforming lots created by rezoning land lying south of Route 78 and west of Route 287 have characteristics which are different from those of land elsewhere in the zone. In addition, Doyle maintained that the R-10 zone results in ten-acre lots abutting much smaller lots in the area of plaintiff's property and that this result is inconsistent with generally accepted planning principles. Doyle further concluded that the R-10 district was not needed to foster the creation of permanent agricultural uses because farmland use had decreased by only one percent since 1987. In addition, because the maximum building size is the same for the R-3 zone as it is for the R-10 zone, Doyle found no difference in the protection of stream corridors afforded by the two zones.
Plaintiff also offered the report of a real estate appraiser, Michael Hedden, who determined that, as of October 17, 1994, the value of plaintiff's property under the R-10 zoning was $920,000 less than it was under the R-3 zoning ($2,760,000 as compared to $1,840,000). Hedden estimated that there were thirty-five buildable lots under the R-3 ordinance, but only ten buildable lots under the R-10 ordinance.
The Township provided a report prepared by Francis J. Banisch, III, a professional planner. Banisch noted that Bedminster's master plans, dating back to 1965, articulated the Township's objectives which include preserving the special character of the countryside and protecting valuable natural resources and environmentally sensitive lands. He further pointed out that the current master plan was heavily influenced by the State Plan, and that the Planning Board decided to move forward with the reduction in density only after the State Plan had been issued in June 1992. In support of the reduced density of development, Banisch cited, among other considerations, soil conditions, which pose constraints on the installation of on-site septic systems throughout the R-10 district. With respect to plaintiff's property, Banisch found the soil to be "[s]evere" with respect to the installation of septic systems, particularly because of a high seasonal water table. Banisch concluded that under the R-10 ordinance the tract had a development potential of twelve units, in addition to the one pre-existing nonconforming lot. Lot averaging would permit twelve buildable lots, with six being as small as six acres each, provided the remaining six lots each exceeded ten acres.
The Township's valuation expert, Richard Reading, concluded that the reduction in the value of the property zoned R-3 as compared to its value zoned R-10, was approximately 9.5%, or $200,000 ($2,105,000 compared to $1,905,000). In addition, Reading concluded that because of the conditions on the site, the number of developable lots was sixteen under the R-3 ordinance and twelve under the R-10 ordinance.
Philip Caton, who testified as a court appointed expert, found that the R-10 zone is substantially consistent with the land use element of the Township's master plan and is designed to effectuate the goals of the master plan's land use element. In addition, he found that the ordinance creating the R-10 zone is consistent with the purposes of the Municipal Land Use Law, specifically N.J.S.A. 40:55D-2(a) (promoting the general welfare), N.J.S.A. 40:55D-2(c) (providing for adequate light, air and open space), N.J.S.A. 40:55D-2(d) (addressing appropriate development), N.J.S.A. 40:55D-2(e) (establishing appropriate population densities), N.J.S.A. 40:55D-2(g) (providing sufficient space based on environmental requirements), *216 and N.J.S.A. 40:55D-2(j) (promoting conservation of open space and valuable natural resources). Caton referred to a study which suggests that ten-acres is the minimum lot size required by municipalities which rely on large-lot zoning to sustain agriculture. He concluded that agricultural preservation was a proper planning consideration for the R-10 zone given that agricultural uses are a significant and continuing presence in the district. With respect to groundwater resource quality, Caton concluded that, based on the geology in the R-10 district, a lot size of six to seven acres is indicated. Caton further determined that the soil conditions pose severe limitations for installation of on-site septic systems throughout most of the district. Caton expressed the view that the State Plan policy regarding the environmentally sensitive planning area supported the Township's position that wetlands would be better protected under an R-10 zone than under an R-3 zone.
Our Supreme Court declared in Riggs v. Township of Long Beach, 109 N.J. 601, 610-11, 538 A.2d 808 (1988) that:
A zoning ordinance is insulated from attack by a presumption of validity, which may be overcome by a showing that the ordinance is "clearly arbitrary, capricious or unreasonable, or plainly contrary to fundamental principles of zoning or the [zoning] statute." The party attacking the ordinance bears the burden of overcoming the presumption.... Courts should not question the wisdom of an ordinance, and if the ordinance is debatable, it should be upheld.
In order to be upheld, a zoning ordinance must satisfy the following objective criteria:
First, the ordinance must advance one of the purposes of the Municipal Land Use Law as set forth in N.J.S.A. 40:55D-2. Second, the ordinance must be "substantially consistent with the land use plan element and the housing plan element of the master plan or designed to effectuate such plan elements,"....Third, the ordinance must comport with constitutional constraints on the zoning power.... Fourth, the ordinance must be adopted in accordance with statutory and municipal procedural requirements.

[Id. at 611-12, 538 A.2d 808 (citations omitted).]
Only the first two of these criteria are material to the present case.
The trial judge (Honorable Robert E. Guterl, J.S.C.), found that the ordinance met the first prong of Riggs:
Kirby does not dispute the consistency of the zoning changes with the Municipal Land Use Law, but rather argues that the motives of township officials were improper and the previous three-acre zoning served the same valid purposes and caused him far less harm. The consistency between the Bedminster Land Use Element ... and the New Jersey State Development and Redevelopment Plan (SDRP) is noted and discussed by Caton.... Although Bedminster was under no legal obligation to comply with its recommendations, the designation of the land now within the R-10 zone as Environmentally Sensitive apparently was the catalyst for Bedminster's revisiting of the planning issues relating to the then R-3 zone. Subsequently the State Planning [C]ommission reviewed the Bedminster Master Plan and the provisions relating to the R-10 zone and determined them to be consistent with the SDRP. While this determination has no binding effect, it is reasonable to consider it as supporting the planning judgment of Bedminster.
Judge Guterl also found that the ordinance met the second prong of the Riggs test:

*217 What emerges from the analysis is a picture of an orderly consideration of all the relevant material, consultation with experts, dialogue with Somerset County and New Jersey planning officials, and solicitation of public input-all leading to the enactment of the R-10 zone. Although the need for a ten acre minimum lot is not established by the carrying capacity analysis, the ten acre zoning is consistent with the carrying capacity determination made thus far. Kirby would have these circumstances discarded from consideration first, on the grounds that Bedminster Township was improperly motivated by fiscal issues and secondly, by an absence of any demonstrated need for change. Kirby's argument is inadequately supported by evidence and precedent.
The judge then turned to the question of whether the ordinance is valid as applied to plaintiff's property. He noted that plaintiff's property is somewhat different from most of the land in the R-10 zone and could easily accommodate more intensive zoning, but he also referred to considerations which support zoning the area R-10:
Somerset County designates Rattlesnake Bridge Road as a scenic corridor and Burnt Mills Road as a scenic roadway and the Township Master Plan identifies a number of local scenic roads, including the two roadsCountry Club and Meadow Roadwhich abut the Kirby property. R-10 zoning would accommodate retention of such characteristics [better] than would any higher density. There are also severe limitations on the soils which support the need for larger lot sizes.
Judge Guterl concluded:
It is evident that Caton viewed ... Bedminster's zoning of the Kirby tract as meeting the Riggs tests, despite his planning preferences. This Court agrees. Under such circumstances Kirby cannot prevail since it is his burden to establish the defective nature of the challenged ordinance. It is not this Court's function to make the choice between two different planning views, both of which are determined to be valid. Under such circumstances, Bedminster's choice cannot be disturbed.... The distinctions between this southern section of Bedminster and the somewhat less developed northern sections are not so marked as to warrant a different conclusion....
....
The substantial evidence in this case supports the conclusion that the changes encompassed in the establishment of the R-10 zoning district are prudent planning measures in aid of valid municipal purposes and goals.
Plaintiff claims that the R-10 ordinance is invalid because there was no reason to change the R-3 zoning. However, it is not the Township's burden to defend the new ordinance; rather, the new ordinance is presumed valid and it is the party attacking the ordinance that bears the burden of overcoming this presumption. Riggs, supra, 109 N.J. at 611, 538 A.2d 808. As Judge Guterl observed:
In Kirby's view, Bedminster must justify the change in zoning, and not merely defend the new requirements without reference to the old. Kirby would shift the burden to Bedminster upon presenting evidence that the three acre zoning was successfully accomplishing the same purposes and there was no need for a change. Kirby has offered no precedent to support the imposition of such an obligation upon Bedminster.
Plaintiff also attacks the ordinance as an example of fiscal zoning. Fiscal *218 zoning, the enactment of zoning regulations for the sole purpose of curbing population growth in order to stabilize the tax rate, is an improper zoning consideration. Oakwood at Madison, Inc. v. Township of Madison, 117 N.J.Super. 11, 18, 283 A.2d 353 (Law Div.1971), certif. granted, 62 N.J. 185, 299 A.2d 720 (1972), on remand, 128 N.J.Super. 438, 320 A.2d 223 (Law Div.1974), mod. on other grounds and aff'd, 72 N.J. 481, 371 A.2d 1192 (1977). Plaintiff bases his argument on the testimony of a member of the public at the October 17, 1994 Township Committee hearing on the R-10 ordinance who, in objecting to the ordinance, read a letter which he claimed was written by the chairman of the Planning Board stating: "Larger lots will result in less homes, less people, less traffic, less septics, less wells, less children in the schools, less need for additional classrooms and teachers, less taxes, more open space and a habitat for endangered species." Such statements, even if made by the chairman of the Planning Board, do not invalidate the ordinance because, as Judge Guterl found, they are "not enough to overcome a record...which demonstrates substantial planning support for the ten-acre minimum requirement.... Kirby simply offers different planning judgment."
Sod Farm Associates v. Springfield Township Planning Board, 298 N.J.Super. 84, 94-96, 688 A.2d 1125 (Law Div.1995), aff'd, 297 N.J.Super. 584, 688 A.2d 1058 (App.Div.1996), certif. denied, 149 N.J. 36, 692 A.2d 49 (1997), is relevant to this discussion. In that case, the plaintiff pointed to comments made by planning board members with respect to the plaintiff's application to be included in the Wastewater Management Plan ("WMP") and claimed that these statements were evidence of fiscal zoning. These comments were to the effect that if the application was granted, the result would be additional school children and increased growth. Plaintiff alleged that the formal resolutions adopted by the planning board were "pretextual coverups of its true intent to stifle housing because of the attendant costs and increased taxes." Id. at 96, 688 A.2d 1125. In rejecting this argument, the court stated, in language relevant to the present case:
In this case there is a clearly expressed and proper zoning purpose both in excluding Plaintiff's property from the WMP and in the zoning amendments Springfield enacted in the years following. That purpose is the preservation of both a rural lifestyle and agriculture as an economically viable business. Where at least one such purpose is substantially supported by the record, it is irrelevant that a few persons spoke of improper motives. Springfield's long history as a rural township; its existing substantial acreage in farmland; its Master Plan[s] of 1988 and 1993 which hold the preservation of farming high in its scale of zoning objectives; its contributions in dollars and in acreage to the County farmland preservation program; and its designation in the recently completed State Development Plan as a "Rural Planning Area" all strongly buttress the Board's conclusion that preserving and maintaining agricultural lands is a significant zoning and planning policy initiative and not simply a pretextual argument to exclude housing. This is especially true where the Township has zoned an area for its [Council on Affordable Housing] allocation of low and moderate income housing and, by inclusion of that area in the WMP, made such housing practical.

[Id. at 97-98, 688 A.2d 1125 (citations omitted).]
This decision accords with the following observation made by the Supreme Court in *219 Riggs, supra, 109 N.J. at 613, 538 A.2d 808 (citations omitted):
In determining whether the ordinance was adopted for an unlawful purpose, we distinguish between the purpose of the ordinance and the motives of those who enacted it. Courts generally will not inquire into legislative motive to impugn a facially valid ordinance, but will consider evidence about the legislative purpose "when the reasonableness of the enactment is not apparent on its face." Clary v. Borough of Eatontown, 41 N.J.Super. 47, 71, 124 A.2d 54 (App.Div.1956). Although the distinction between motive and purpose can be fuzzy, "motive" ordinarily addresses the subjective considerations that move a legislator, and "purpose" speaks to the goals to be achieved.... The determination of "purpose" depends on objective factors, such as the terms of the ordinance and its operation and effect, as well as the context in which the ordinance was adopted.
If an ordinance has both a valid and an invalid purpose, courts should not guess which purpose the governing body had in mind. If, however, the ordinance has but one purpose and that purpose is unlawful, courts may declare the ordinance invalid.
We therefore reject plaintiff's contention that the R-10 ordinance constitutes impermissible fiscal zoning.
In further support of plaintiff's argument that the ordinance is invalid, he points to the comments and conclusions made by Caton that five- or six-acre zoning is more appropriate for the land in the R-10 district lying south of Route 78, which includes his land. In rejecting this argument, Judge Guterl explained:
Caton would prefer some different zoning for the area containing the Kirby tract. His conclusions are based upon planning preferences.... That planning preference, however, is of little legal significance.... It is evident that Caton viewed ... Bedminster's zoning of the Kirby tract as meeting the Riggs tests, despite his planning preferences. This Court agrees. Under such circumstances Kirby cannot prevail since it is his burden to establish the defective nature of the challenged ordinance. It is not this Court's function to make the choice between two different planning views, both of which are determined to be valid. Under such circumstances, Bedminster's choice cannot be disturbed.
Finally, plaintiff contends that the ordinance is invalid because of the large number of nonconforming lots it creates. We disagree, plaintiff has not established that so large a proportion of the district will be non-conforming as to make the ordinance arbitrary and capricious.
Judge Guterl rejected plaintiff's attack on the lot averaging ordinance in the following terms:
N.J.S.A. 40:55D-40 is entitled "Discretionary contents of subdivision ordinance." While the [statute] refers to promoting flexibility, it also calls for the establishment of standards, thereby creating two forces which may pull in opposite directions. Caton considers it to be reasonable, while he notes room for specific improvement in terms of the ordinance standards which he believes could be more clearly spelled out. There is also some question about the degree of discretion left to the Planning Board in the ordinance. But Caton expressly declines to suggest invalidation would be proper. The statute is not specific and is meant to allow flexible responses to the unique challenges of each application. The ordinance is a reasonable response to that statute. Kirby *220 has offered no applicable precedent to warrant invalidation on this ground.
Plaintiff's challenge relates to the design criteria portion of the lot averaging ordinance. This part of the ordinance reads:
Lot size averaging may be permitted in the sole discretion of the Planning Board when it determines that the goals and objectives of the Master Plan and the Land Development Ordinance are better served by the lot size averaging plan than by a conventional plan. The applicant shall clearly demonstrate to the Board that the lot size averaging plan is preferable to the conventional plan in the achievement of the goals, objectives and purposes of this Ordinance and the Bedminster Township Master Plan. Factors to be considered in this demonstration include, but are not limited to, stream corridor and wetlands preservation, steep slope protection, agricultural retention, overall site design, reduction in impervious coverage, traffic circulation, and the site's natural features, topography, and relationship to open spaces on neighboring parcels.
Planning Board approval of a lot averaging subdivision shall only be granted when the applicant demonstrates that the lot averaging design better promotes the objectives of the Bedminster Township Master Plan than would a conventional ten (10) acre lot subdivision. In this regard, specific attention shall be paid to the ability of the lot averaging plan to promote the strategies advocated in the Conservation Plan Element (i.e.farmland retention, stream corridor protection, conservation of scenic vistas and features, etc.)
By way of Ordinance No. 97-43, adopted on December 29, 1997, the Township Committee amended the design criteria of the lot averaging ordinance to provide that lotsize averaging "shall" be permitted when the Planning Board determines that the goals and objectives of the master plan and the land use ordinance are better served by such a plan, thus eliminating the "may be permitted" and "discretion" language, as well as the word "only" in the first sentence of the second paragraph of the original ordinance.
The lot averaging ordinance modifies the general ordinance setting forth the criteria for the R-10 zone. Its flexibility accords with its enabling legislation, N.J.S.A. 40:55D-40, which provides:
An ordinance requiring subdivision approval by the planning board pursuant to this article may also include:
....
b. Standards encouraging and promoting flexibility, economy and environmental soundness in layout and design in accordance with which the planning board may approve the varying, within a conventional subdivision, of lot areas and dimensions, and yards and setbacks otherwise required by municipal development regulations in such a way that the average lot areas and dimensions, yards and setbacks within the subdivision conform to the conventional norms of the municipal development regulations; provided that such standards shall be appropriate to the type of development permitted.
Given the liberal language of N.J.S.A. 40:55D-40(b), and the amended language of the lot averaging ordinance limiting the Planning Board's discretion in considering such applications, plaintiff's argument for the invalidity of the lot averaging ordinance is without merit.
Plaintiff contends in support of his "taking" arguments that the Township has utilized its zoning power improperly by acquiring open space without paying for it. Plaintiff argues that he should receive *221 compensation for the time period in which the R-10 ordinance has been in effect because the ordinance has deprived him of an investment opportunity because he could not market the property for sale.
The Township responds that the ordinance does not constitute a regulatory taking because plaintiff still has economically viable uses of the land and the ordinance advances legitimate state interests.
In rejecting plaintiff's regulatory taking claim, Judge Guterl concluded:
Kirby understandably is also unhappy with the increase in lot size which will almost certainly have a negative effect on the value of this property. Even on the assumption that a significant loss of value is established, it does not follow that there has been an unconstitutional taking.... The property continues to be used for farming and residential purposes (with farmland assessment) as it has for at least twenty years. Under these circumstances, it is not convincing to assert it has no viable economic use and Kirby has conceded this point. Even the amount of the alleged loss in value asserted by Kirby is unconvincing.... Kirby's expert appraisal report is of little value since there was clearly no reasonable basis for the appraiser's conclusion that the property had a 35 lot development potential.... The difference in value, according to Bedminster's expert, was as little as $15,000 or as much as $200,000, depending on the approach to development taken. On the other hand, Kirby offered no worthwhile evidence to challenge the testimony offered on behalf of Bedminster.... As noted above, the Zoning Ordinance challenged was designed to achieve a legitimate governmental objective and even a substantial diminution in value under such circumstances is not enough to effect a taking.
Generally speaking, where governmental regulatory action denies an owner substantially all economically beneficial use of his or her land, a taking has occurred and the property owner must be compensated. See Agins v. City of Tiburon, 447 U.S. 255, 262-63 & n. 9, 100 S.Ct. 2138, 2142-43 & n. 9, 65 L.Ed.2d 106, 113 & n. 9 (1980). However, "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." Concrete Pipe & Prods. of California, Inc. v. Construction Laborers Pension Trust for Southern California, 508 U.S. 602, 645, 113 S.Ct. 2264, 2291, 124 L.Ed.2d 539, 579 (1993). Nor, absent interference with an owner's legal right to dispose of his or her land, does a substantial reduction in the attractiveness of the property to potential purchasers entitle the owner to compensation. Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 15, 104 S.Ct. 2187, 2197, 81 L.Ed.2d 1, 14 (1984). See also Gardner v. New Jersey Pinelands Comm'n, 125 N.J. 193, 210, 593 A.2d 251 (1991) (neither diminution of land value nor impairment of the marketability of land alone constitutes a taking). In addition, courts will look to the extent to which the "regulatory action interferes with the [property] owner's `distinct investment-backed expectations'" and whether such expectations were reasonable. Karam v. State Dep't of Envtl. Protection, 308 N.J.Super. 225, 235, 705 A.2d 1221 (App.Div.1998), aff'd o.b., 157 N.J. 187, 723 A.2d 943 (1999).
With respect to the value of the property, Hedden, plaintiff's expert, concluded that the property was worth approximately one-third less under the R-10 ordinance than under the R-3 ordinance; Reading, the Township's expert, concluded that the reduction in value was approximately nine and one-half percent. Judge Guterl found Reading's valuation "far more convincing." Even accepting Hedden's figures, there *222 has not been a taking. See Bernardsville Quarry, Inc. v. Borough of Bernardsville, 129 N.J. 221, 238-40, 608 A.2d 1377 (1992) (over ninety percent reduction in the value of the subject property did not constitute a taking). Nor has plaintiff proved that the R-10 ordinance interfered with his investment-backed expectations. Consequently, there has been no regulatory taking of plaintiff's property.
We have carefully considered all of the arguments which plaintiff has advanced in support of his appeal. On the basis of the record submitted to us and the applicable law, we affirm the judgment appealed from.
NOTES
[1] Southern Burlington County N.A.A.C.P. v. Township of Mount Laurel, 67 N.J. 151, 336 A.2d 713, appeal dismissed and cert. denied, 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975).